# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Marcia Przybysz,                                             Case No. 3:16CV0353

        Plaintiff

    vs.                                                          **ORDER**

City of Toledo, *et al.*,

        Defendants.


This is a 42 U.S.C. § 1983 dispute over the death of Thomas Przybysz (Thomas), a young man who agreed to act as an informant for the Toledo Police Department. In retribution for his assistance to the police, the target of the investigation later orchestrated Thomas' murder.

Marcia Przybysz (Przybysz), Thomas' mother and the personal representative of his estate, seeks to hold Toledo Police Sergeant Karrie Williams individually liable for Thomas' death. She also seeks recovery against the City of Toledo pursuant to *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978).

Jurisdiction is proper under 28 U.S.C. § 1331.

Pending are the parties' counter-motions for summary judgment. (Docs. 37, 38). Also pending are plaintiff's motions to exclude defense expert Michael Levine's testimony, and to strike the affidavit of the undercover officer who assisted in the operation. (Docs. 53, 54).

For the reasons discussed below, I deny plaintiff's motions and grant defendants' motion.

**Background**

On April 13, 2014, Toledo Police arrested Thomas at a local McDonald's. Thomas was "highly intoxicated" and had controlled substances on his person. State authorities charged him with several drug offenses and (on account of his daughter's presence) child endangerment. (Doc. 37-2, ID 616-18).

After his arrest, Sgt. Williams informed Thomas he could "work off" his charges if he agreed to act as an informant. Thomas took Sgt. Williams up on the offer and contacted her a week later with information concerning his supplier, Scott Warnka. (Doc. 40, ID 845-46).

Warnka sold cocaine at Thomas' workplace, the Toledo Jeep assembly plant, using Thomas' car as the drop off point. Thomas would take money from purchasers inside the plant and leave it in his car. Then, Warnka "would come up to the Jeep plant, take the money . . . and replace it with dope." (Doc. 40, ID 847).

Sgt. Williams arranged for an undercover officer to meet Warnka for an initial controlled buy on May 13, 2014. (*Id.*; Doc. 43, ID 917). Thomas told the undercover officer where to find his car and what to expect when Warnka arrived. (Doc. 43, ID 917-18).

The first buy went off without a hitch. The undercover officer dressed as a Jeep employee and purchased $50 worth of cocaine from Warnka. (*Id.*). Warnka testified that at the time, he was unaware his customer was working for the police. (Warnka Dep. at 13-14).

Less than a week later, Thomas called Sgt. Williams again. He told her Warnka was eager to "get rid of" his supply and planned to "leave town" for the weekend, prompting Sgt. Williams to arrange a second controlled buy on May 21, 2014. (Doc. 40, ID 848). This time, the

undercover officer contacted Warnka directly, without using Thomas as a go-between. The two again met in Thomas' car outside the Jeep plant. (*Id.*).

When the undercover officer completed the deal, he remarked that "everything [was] copasetic"—signaling to a nearby surveillance team that it was time to move in and make an arrest. (Doc. 43, ID 919-20). Several masked officers rushed the car and arrested Warnka. They also "arrested" the officer so as not to blow his cover. (Doc. 40, ID 849-50; Doc. 43, ID 920-21; Warnka Dep. at 41-43).

Warnka had realized immediately that Thomas had set him up. No one had explicitly told him as much, but Warnka deduced the connection first, because "[p]eople who get high don't use th[e] word" "copasetic," and second, because an unidentified arresting officer told him "right at the scene" that he "just sold to an undercover cop." (Warnka Dep. at 42-45).[1]

Warnka bonded out of jail the next day (May 22), and began threatening Thomas via text message that same evening. Thomas reported the texts to Sgt. Williams, who called him within six hours of learning about the threats. (Doc. 37-1, ID 608-12; Warnka Dep. at 49, 59-61; Doc. 40, ID 853).

Sgt. Williams testified that during their conversation, Thomas "was not concerned" that Warnka would actually "do the things that he was threatening" to do. (Doc. 40, ID 852). He assured her that if Warnka came to his house, he would "defend himself," though "he said

---

[1] Defendants dispute Warnka's claim that an unidentified officer told him he sold drugs to an undercover police officer. Viewing the evidence in a light most favorable to plaintiff, as I must, I credit his testimony.

something about not having a CCW." (Doc. 37-1, ID 611). Sgt. Williams told him to save the text messages so the state could use them to charge Warnka with intimidation. (Doc. 40, ID 852).[2]

Shifting the conversation back to his work as an informant, Thomas asked Sgt. Williams to get in touch with his employer about an upcoming drug test. He also offered to facilitate a third controlled buy for the Toledo Police "for free." (Doc. 37-1, ID 612).

That night, John Haugh (one of Warnka's associates) camped outside Thomas' home. When Thomas returned from work in the early morning hours of May 23, 2014, Haugh attacked Thomas, fatally stabbing him. An Ohio jury convicted Haugh of aggravated murder. Warnka pleaded guilty to first-degree manslaughter for his role in encouraging the attack. *See State v. Haugh*, 2016-Ohio-8008, 2016 WL 7102972, *1, 4 (Ohio App.).

Plaintiff subsequently filed this § 1983 action against the City of Toledo and several individual officers, including Sgt. Williams. She seeks damages and injunctive relief requiring defendants to implement "additional training . . . so that [officers] will be better prepared" to safely conduct confidential-informant investigations. (Doc. 6, ID 17).

## Discussion

### A. Motion to Strike the Undercover Officer's Affidavit

In support of their motion for summary judgment, defendants offered an affidavit from the undercover officer who purchased cocaine from Warnka. Przybysz moves to strike that

---

[2] Sgt. Williams ran a background check on Warnka. She found "nothing . . . major" in his criminal history. (Doc. 40, ID 846).

evidence on the theory that it amounts to a "sham affidavit"—one that impermissibly, under prevailing Sixth Circuit case law "directly contradicts, without explanation," the officer's "previous testimony." *Arel, S.R.L. v. PCC Arifoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) (citation omitted).

The rule against sham affidavits prevents a party from submitting a post-deposition affidavit that contradicts his earlier sworn testimony. *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016). Plaintiff contends it applies here because the undercover officer gave conflicting accounts about his use of the term "copasetic" during the controlled buy leading to Warnka's arrest.

Specifically, in his affidavit, the undercover officer attested that he used the word "copasetic" during both the May 14, and May 21, transactions. (Doc. 37-3, ID 620-21). Yet, according to plaintiff, the officer "never testified" that he used "copasetic" during the May 14, purchase in his deposition. Rather, she claims the undercover officer testified that he used the term only during the May 21, purchase as a signal to initiate Warnka's arrest. (Doc. 54, ID 1323).

Plaintiff is mistaken.

Although Przybysz's counsel did not specifically question him about the language he used during the May 14, purchase, the undercover officer volunteered that he did, in fact, use "copasetic" in on both occasions:

Q: When you used the word 'copasetic' the first time, did Scott Warnka turn around and say, 'What did you say?'

A: Well, the first time that day was one thing. But I had used it the first time at the first buy. That's why we used it as this code word [during the second buy].

(Doc. 43, ID 920).

I must strike a sham affidavit where a party uses it to create a disputed issue of fact in the face of previous testimony "indicat[ing] that no such dispute exists." *Aerel*, 448 F.3d at 907. "This is a far cry, however, from preventing a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn [non-contradictory] affidavit." *Id.*; *see also Briggs v. Potter*, 463 F.3d 507, 513–14 (6th Cir. 2006). That is all defendants do here.

Przybysz has not identified any contradiction, much less the type of "clear, direct contradiction" ordinarily necessary to exclude an affidavit. *Siewestersen v. Worthington Steel Co.*, 134 F. Supp.3d 1091, 1099 (N.D. Ohio 2015) (citing *Aerel*, 448 F.3d at 909). Accordingly, I deny plaintiff's motion to strike the affidavit.[3]

## B. Motion to Exclude Defense Expert's Testimony

Next, plaintiff moves to exclude the testimony of defendants' expert, Michael Levine. Levine testified that, "in consideration of the totality of [the] circumstances," Sgt. Williams' handling of the investigation and her reaction to Warnka's threats against Thomas was "perfectly reasonable." (Doc. 53-1, ID 1296).

---

[3] I note that, in any event, even if a discrepancy existed between the deposition testimony and affidavit, it would hardly have been material, much so substantial as to call for the affidavit's exclusion.

Federal Rule of Evidence 702 requires me to perform a "gate-keeping" function when considering the admissibility of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 applies not only to scientific testimony, but also to other types of expert testimony based on technical or other specialized knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

My gate-keeping duties here are threefold.

First, I determine whether the witness is qualified as an expert; second, whether his testimony is reliable; and third, whether the expert's reasoning or methodology properly applies to the facts at issue—whether, in other words, his opinion is relevant. *Buck v. Ford Motor Co.*, 810 F. Supp.2d 815, 822 (N.D. Ohio 2011).

Przybysz challenges Levine's testimony on all three grounds.

## 1. Levine's Qualifications

First, plaintiff argues that Levine "does not have the requisite, relevant law enforcement experience" necessary to testify as an expert because he retired from the United States Drug

Enforcement Agency in 1990. (Doc. 53, ID 1276, 1280). Her observation touches on only one aspect of Levine's resume while ignoring the larger whole.

Levine worked in federal law enforcement for approximately twenty-five years, splitting his time between the DEA and the United States Department of Justice. (Doc. 53-1, ID 1286). One of his "primary positions" was that of an "undercover special agent . . . working with informants, making street buys to much larger buys in . . . the enforcement of narcotic laws." (*Id.* at 1283). His investigations ranged from large international drug trafficking cases "right down to street level" cases. (*Id.*).

"A good portion" of Levine's work included the "flipping of informants" from offenders into "assets" for government investigations. (*Id.*). In 1973, Levine authored a DEA training manual on "informant and undercover [investigation] tactics." (*Id.* at 1285). Later, he supervised a group of fifteen to twenty agents, each of whom "handl[ed] numbers" of "undercover cases . . . generated from . . . street level" informants. (*Id.* at 1283).

Regarding his supervisory duties, Levine explained:

During my 17 years supervisory service with the DEA, in accordance with Department of Justice and DEA training and [standard operating procedures], I was also made responsible for the initial investigation of all allegations and/or complaints emanating from the use of undercover tactics and/or informant handling procedures, occurring under my command . . . I had occasion to investigate said incidents occurring in [the] DEA, NYPD, FBI, BATF, US Customs, New York State Police, Miami Police, US Immigration and Naturalization Officers and other police agencies involved in DEA task force organization units.

(Doc. 50-3, ID 1005).

On retiring in 1990, Levine became a trial consultant, representing both private and government interests. (Doc. 53-1, ID 1284). His resume lists a plethora of cases he has worked on since 2007 alone, a number of which involved "oversight of undercover investigative and informant handling practices." (Doc. 50-3, ID 1030-40).

Apart from his work as a trial consultant, Levine also contracts with state and federal agencies to train law enforcement agencies and officers in "informant handling and undercover tactics." (Doc. 53-1, ID 1284). Between 2008 and 2012, for instance, Levine taught courses on informant and undercover investigations for "New York Police agencies throughout the state." In 2014, the State Department retained him to teach a similar course for the Brazilian federal police. (*Id.* at 1285). And since 2003, two Georgia district attorneys' offices have had Levine on retainer as a trial consultant, case reviewer, and expert witness in police-involved shootings. (*Id.*; Doc. 50-3, ID 1000).

Given Levine's lengthy and relevant experience, defendants have carried their burden to prove his qualification as an expert in the "discrete police-practice" of street level undercover and informant investigations. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 908 (6th Cir. 2004).

Plaintiff's complaint that Levine's experience is "dated" or "too limited" go to the weight of his testimony, not its admissibility. *Lee v. Metro. Gov't of Nashville and Davidson Cty.*, 596 F. Supp.2d 1101, 1122 (M.D. Tenn. 2009); *see also Alvarado v. Oakland Cty.*, 809 F. Supp.2d

680, 692 (E.D. Mich. 2011) (expert's reliance on "allegedly outdated" materials "go to the weight of [an expert's] testimony, not its admissibility" (footnote omitted)).[4]

## 2. Reliability of Levine's Testimony

Plaintiff also maintains that Levine's opinion is unreliable because "the facts/data he relies on are inaccurate." (Doc. 53, ID 1276, 1278-79). But the "inaccuracies" plaintiff identifies are well-supported in the record.

For instance, Przybysz disputes Levine's claim that Thomas was "eager" to be an informant. (*Id.* at 1276). Thomas *was* eager to be an informant.

He contacted Sgt. Williams after his arrest, volunteering information about Warnka, and volunteering to introduce Warnka to the undercover officer. Thomas also warned Sgt. Williams that Warnka was looking to sell a larger amount of cocaine and could be leaving the area, encouraging her to initiate a second controlled purchase. And even after Warnka threatened him, Thomas offered to assist the police in another controlled buy "for free." (Doc. 37-1, ID 612).

Przybysz also takes issue Levine's characterization of Thomas as an "experienced 'street dealer.'" (Doc. 53, ID 1276). Thomas *was* an experienced street dealer.

He told Sgt. Williams that he regularly helped Warnka sell cocaine at the Jeep Assembly Plant. This, moreover, was not Thomas' first foray into the local drug trade.

---

[4] It is, moreover, unlikely that proper handling of informants has changed over the years, indeed, over decades. Certainly, the area of Levine's expertise is nothing like astrophysics or molecular biology, or other fields where tomorrow can render yesterday's knowledge obsolete. The plaintiff has, in any event, not shown that Levine's experience before 1990 and the work he has done since is somehow, in fact, outdated, or that others in his area of expertise currently dispute his approach and views on how to work effectively with informants and protect their safety.

In 2012, another undercover officer for the Toledo Police Department sought a warrant for Thomas' arrest after learning that he was selling suboxone, "a drug heroin users use to step down from heroin." (Doc. 37-4, ID 623).[5] Levine also had access to Thomas' criminal history report, which detailed a prior burglary in which Thomas made off with the victim's prescription drugs. (Doc. 50-3, ID 1029; Doc. 59-2, ID 1448-52).

Where Przybysz does find factual errors in Levine's testimony, they are inconsequential to the expert's broader conclusions. Levine's report, for example, indicates that Thomas facilitated the second controlled buy for "$700 worth of cocaine," when in fact the undercover officer purchased $300 worth of cocaine—an error Levine resolved at his deposition by explaining that he took the $700 figure from an arrest report. (Doc. 53, ID 1276; Doc. 53-1, ID 1291-92).

Levine likewise noted that Toledo Police arrested Thomas for selling suboxone in 2012. (Doc. 53, ID 1276). On the record before me, it is not clear that they did. But it is at least clear that authorities issued a warrant for such an arrest, because defendants attached that warrant to their motion for summary judgment. (Doc. 59, ID 1397; Doc. 37-4, ID 622-24).

Arrest or no arrest, the takeaway from this information is the same: the Toledo Police had probable cause to believe Thomas was selling prescription drugs in 2012. That fact, along with Thomas' admission to selling cocaine at the Jeep Assembly plant, reasonably informed Levine's characterization of Thomas as an "experienced" dealer.

---

[5]Thomas also volunteered to work as an informant in 2012, once he realized he had attempted to sell suboxone to an undercover officer. Police rejected his offer because the information Thomas was willing to provide was "not sufficiently useful." (Doc. 37-4, ID 623).

I must exclude expert testimony based on "mere guess or speculation." *United States v. L.E. Cooke, Co.*, 991 F.2d 336, 342 (6th Cir. 1993) (citation omitted). But opinions "based upon facts in the record" are "not 'assumptions' or 'guesses.'" *In re Scrap Metal Antitrust Lit.*, 527 F.3d 517, 530 (6th Cir. 2008) (citation omitted).

Przybysz may disagree with Levine's characterizations or dispute the facts on which he relies. But those facts (or substantially equivalent facts) still appear in the record. Courts "generally permit testimony based on allegedly erroneous facts" so long as "there is some support for those facts in the record." *Id.*

Because the facts underlying Levine's opinion find at least that minimal level of support, the minor "weaknesses" plaintiff identifies "bear on the weight of the evidence rather than on its admissibility." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quoting in part *Cooke*, 991 F.2d at 342); *see also In re Scrap Metal*, 527 F.3d at 530–31 (challenges to record-supported opinions "go to the accuracy of the conclusions, not to the reliability of the testimony").

### 3. Levine's Methodology

Finally, plaintiff complains that Levine "identifies no methodology to draw his conclusions" and "relies solely on his [law enforcement] experience" to reach his findings. (Doc. 53, ID 1279). This is wholly acceptable. "An expert may certainly rely on his experience in making conclusions, particularly in this context where an expert is asked to opine about police behavior." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005).

If an expert relies "solely or primarily on experience, then the witness must explain how that experience leads to the conclusion [he] reached." *Id.* My role as gatekeeper "requires more than simply 'taking the expert's word for it.'" *Id.* (quoting Fed. R. Evid. 702 advisory committee's note (2000)). Bearing that role in mind, I find that Levine adequately connected his experience to his conclusions.

Levine testified, for example, that Sgt. Williams planned to arrest Warnka immediately after the second buy based on what he described as "exigent circumstances"—"exigent in the sense that it would put a police officer running this particular case in a circumstance where she should make an arrest, should take action to stop the man from leaving the jurisdiction." (Doc. 53-1, ID 1295). Thomas told Sgt. Williams that Warnka was planning to leave the area for the weekend. This, according to Levine, created a "certain urgency to get [Warnka] before he left town with the quantity of drugs." (*Id.*).

Looking "through the eyes of somebody who's been deeply involved with that level of narcotic enforcement," Levine also emphasized that threats to informants "come along with about 90 percent of these cases." (Doc. 53-1, ID 1300). Not all are serious. While some threats may warrant protective measures, Levine recalled that he often "took no action," or implemented "no [protective] measures at all." (*Id.*).

He believed "under the circumstances" that Sgt. Williams' decision to call Thomas, but take no further action, was reasonable based on what she reported about their conversation. Levine noted that rather than asking Sgt. Williams for protection, Thomas was "more interested in continuing his career as an . . . undercover informant." (Doc. 53-1, ID 1300). Sgt. Williams

could therefore reasonably believe that Thomas could, as he said, "handle it" himself. (*Id.* at 1299).

On the whole, Levine is qualified, his testimony is record-supported, and he explained how his experience led to his belief that Sgt. Williams acted reasonably. I therefore deny plaintiff's motion to exclude Levine's testimony.

## Summary Judgment

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The standard of review for counter-motions for summary judgment does not differ from the standard when one party files such a motion. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

The movant must initially show the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant meets that burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

### A. § 1983 claim Against Sgt. Williams

Section 1983 provides a federal cause of action for civil damages against state actors who deprive an individual of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. In this case, Przybysz argues Sgt. Williams violated Thomas' substantive due process rights under the Fourteenth Amendment when she failed to protect him against a fatal attack by Haugh, a private citizen.[6] Defendants counter that qualified immunity precludes recovery.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). This doctrine balances "the need to hold public officials

---

[6] Plaintiff also alleges a violation of her own Fourteenth Amendment right to familial association with Thomas, although she devotes no attention this claim in her motion for summary judgment, or brief in opposition to defendants' motion. This is reason enough to grant defendants summary judgment on the claim. *See Southward v. FedEx Freight, Inc.*, 98 F. Supp.3d 926, 932 (S.D. Ohio 2014) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)).

Beyond that, it is not clear that such a claim is cognizable. Parents undoubtedly have a constitutionally protected liberty interest in the familial connection to their minor children. *Kottmyer v. Maas*, 436 F.3d 684, 689–90 (6th Cir. 2006). But whether this Circuit recognizes a cause of action for deprivation of that interest in the case of harm to a parent's competent *adult* child is an open question. *Cf. Kolly v. Adult Protective Servs.*, 725 F.3d 581, 585 (6th Cir. 2013) (implicitly recognizing such a claim as alleged by the parents of a developmentally disabled adult); *but see Nelson v. City of Madison Heights*, 845 F.3d 695, 703 n.5 (6th Cir. 2017) (declining to address the issue in an action asserted by the parent of a competent adult). In the absence of case law putting this question "beyond debate," Sgt. Williams is entitled to qualified immunity on Przybysz's familial association claim. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Furthermore, as explained *infra*, plaintiff's § 1983 claims (whether asserted on her own behalf, or behalf of her son's estate) do not fall within the special-relationship exception, or the state-created-danger exception.

accountable when they exercise power irresponsibly" against "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

My qualified immunity analysis is two-pronged: first, I must decide whether the officer's conduct violated a constitutional right; and second, whether that right was clearly established at the time of the alleged misconduct. *Id.* at 232. It does not matter which prong I decide first; I must use my discretion "in light of the circumstances in the particular case at hand." *Id.* at 236.

Thomas' "interest in preserving h[is] life is one of constitutional dimension." *Kallstrom, v. City of Columbus*, 136 F.3d 1055, 1063 (6th Cir. 1998) (citation omitted). But "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cty. Dep't. of Soc. Servs.*, 489 U.S. 189, 195 (1989). The Clause is "a limitation on the State's power to act," not "a guarantee of certain minimal levels of safety and security." *Id.*

There are, however, two exceptions to this general rule: the special-relationship exception, and the state-created-danger exception. *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006). Plaintiff relies on both in support of her § 1983 claim.

### 1. Special-relationship exception

First, "[w]hen the State has so restrained the liberty of the individual that it renders him unable to care for himself, the State has a special relationship with the individual and thus an affirmative duty to protect him." *Id.* This affirmative duty "arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the

limitation which it has imposed on his freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200.

Demonstrating that Sgt. Williams knew of Warnka's threats based on her text message conversations with Thomas is therefore not enough; plaintiff must show that the State "affirmative[ly] . . . restrain[ed]" him "through incarceration, institutionalization, or other similar [means]." *Jones*, 483 F.3d at 690 (quoting *DeShaney*, 489 U.S. at 200).

Przybysz fails to make that showing. Asking an individual to serve as an informant does not "'impose' any constraint 'on his freedom to act.'" *Summar v. Bennett*, 157 F.3d 1054, 1059 (6th Cir. 1998) (quoting *DeShaney*, 489 U.S. at 200 (brackets omitted)). Thomas voluntarily agreed to facilitate the controlled buys between Warnka and the undercover officer, regardless of whether Sgt. Williams' representations "motivated" his decision. *See id.* ("Summar voluntarily agreed to serve as a confidential informant, albeit motivated by [the] Officer['s] promises regarding the decedent's pending drug charge." (internal quotation marks omitted)).

### 2. State-created-danger exception

State actors may also be liable for private acts of violence where "the State causes or greatly increases the risk of harm through its own affirmative acts." *Jones*, 438 F.3d at 690 (quoting *Kallstrom*, 136 F.3d at 1066 (brackets omitted)). To succeed on a state-created-danger claim, plaintiff must show:

> (1) an affirmative act by which the state either created or increased the risk that the decedent would be exposed to an act of violence by a third party; (2) a special danger to the decedent wherein the state's actions placed the decedent specifically at risk, as distinguished from the public at large; and (3) the state knew or should have known that its actions specifically endangered the decedent.

*Nelson*, 845 F.3d at 700 (citation and brackets omitted).

The decision in *Nelson* is plaintiff's best state-created-danger case. There, the decedent, Shelly Hilliard, put undercover Officer Chad Wolowiec in touch with her drug dealer, Qasin Raqib, to "work off" a pending drug possession charge. *Id.* at 698. Police arrested Raqib and his cohort, Marquita Clark, during a traffic stop on their way to deliver the drugs to Hilliard. *Id.*

Immediately after the arrest, Officer Woloweic "explicitly told [Clark] that Hilliard had set up Raqib for arrest." *Id.* Clark, in turn, "told Raqib that Hilliard had informed on him." *Id.* Four days later, Raqib and an accomplice abducted and murdered Hilliard. *Id.* at 699.

The district court denied Officer Woloweic qualified immunity on a state-created-danger claim asserted by Hilliard's mother, and the Sixth Circuit affirmed. In so doing, the court distinguished *Summar v. Bennett*, *supra*, an earlier informant-related decision that, if followed, would have favored granting Officer Woloweic's motion for summary judgment.

The officer in *Summar* gave a prosecutor a confidential informant's name for disclosure in an indictment. "The indictment was served on [the charged defendant] on May 21 . . . . [the informant] was killed by gunshot wound to the neck three or four days later." 157 F.3d at 1056. The court held that the disclosing officer was not liable for the murder because the informant "voluntarily elected to serve as a confidential informant, despite being advised that he would have to testify and reveal his status as an agent to the police." *Id.* at 1058.

But "Hilliard's case [wa]s different." *Nelson*, 845 F.3d at 700. According to the court in *Nelson*:

> No one advised Hilliard that she would have to, nor did she agree to, "testify and reveal [her] status." She simply agreed to help the officer apprehend a drug

dealer. There was no discussion of any future need for her help after the traffic stop that would lead to Raqib's arrest, nor was there any apparent likelihood that the police would publicly reveal her identity following Raqib's arrest. Thus, unlike the facts in *Summar*, Hilliard's voluntary election to serve as a confidential informant did not come with conditions that would have put her on notice that her identity would eventually become public under the agreement.

*Id.* (citation omitted).

Moreover, Officer Wolowiec "directly disclosed Hilliard's identity to the person he was supposed to protect her from by telling [Clark] about the setup." *Id.* at 701. This "placed Hilliard in special danger by increasing the likelihood that a private actor would deprive her of her liberty interest in personal security." *Id.* at 702.

Przybysz notes that like Hilliard, Thomas' "voluntary election to serve as a confidential informant did not come with conditions that would have put [him] on notice" that his identity could be revealed to Warnka. *Id.* at 700. She is correct; Sgt. Williams testified she and Thomas never discussed the possibility that he would testify against Warnka in court. (Doc. 40, ID 851).

Also like the plaintiff in *Nelson*, Przybysz claims that the Toledo Police "created and increased" the danger to Thomas by "recklessly arresting" Warnka and revealing that he sold drugs to an undercover officer. (Doc. 38, ID 682). Of course, unlike in *Nelson*, no officer in this case actually told Warnka that Thomas "informed on him." *Id.* at 698.

But setting aside that distinguishing fact, Przybysz faces another, more substantial obstacle: in this case, there is no evidence that Sgt. Williams—the person plaintiff seeks to hold individually liable for her son's death—was the unidentified officer who told Warnka that he "just sold to an undercover cop." (Warnka Dep. at 43).

In the § 1983 context, this defect is fatal.

Section 1983 is an individual-liability statute. Thus, "case law teaches that in order to impose individual liability upon a law officer engaging in unconstitutional misconduct, it is a plaintiff's burden to specifically link the officer's involvement to the constitutional infirmity." *Burley v. Gagacki*, 834 F.3d 606, 615 (6th Cir. 2016). "Each defendant's liability must be assessed individually based on his actions,"*Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010), because each defendant "is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

Przybysz does not "specifically link" Sgt. Williams to the alleged disclosure. Even if telling Warnka that he "just sold to an undercover cop" is comparable to the "explicit[]" identification in *Nelson*, 845 F.3d at 698, there is no evidence that Sgt. Williams actually made that statement. Warnka never claimed she did.

He testified only that an unidentified "[t]hey" told him "right at the scene" that he "just sold to an undercover cop." (Warnka Dep. at 43). "They" is not the same as Sgt. Williams. *See Nichols v. Fernandez*, 686 F. App'x 532, 534 (9th Cir. 2017) (affirming summary judgment for individual officers where "Plaintiffs d[id] not provide evidence that Officers . . . Fernandez and . . . Beard disclosed Plaintiffs' status as confidential informants.").

Plaintiff points to no evidence suggesting that Sgt. Williams spoke to Warnka, or that she was even present "right at the scene" at the time of his arrest.[7] Nor does she contend that Sgt.

---

[7] My own review of Sgt. Williams' deposition confirms that she was, in fact, present for the arrest, though this gets plaintiff no further. Sgt. Williams denies telling Warnka that he "just sold to an undercover cop," and denies hearing any other officer make such a statement. (Doc. 40, ID 849-50). "As a general rule, mere presence at the scene [of constitutional misconduct], without a showing of direct responsibility for the action, will not subject an officer to liability." *Ghandi v. Police Dep't*

Williams "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending [unnamed] officers" in a supervisory capacity. *McQueen v. Beecher Comm. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006) (citation omitted).

Insofar as Przybysz complains about the undercover officer's use of "copasetic" as a code word, this argument fails for the same reason.[8] Sgt. Williams did not use "copasetic." The undercover officer did. And plaintiff proffers no evidence indicating that Sgt. Williams had anything to do with his decision to do so.

Because Przybysz has not established that Sgt. Williams "affirmative[ly] . . . created or increased the risk" of harm to Thomas, *Nelson*, 845 F.3d at 700, she has failed to "specifically link" Sgt. Williams to the "constitutional infirmity," *Burley*, *supra*, 834 F.3d at 615, and cannot hold her individually liable for failing to protect Thomas against a state-created danger.[9] This case is governed not by the *Nelson* decision, but by the general rule in *DeShaney*, *supra*: that a

---

*of City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984).

[8] Choice of a particular code word is not, in any event, comparable to "explicitly" identifying an informant. *Cf. Nelson*, 845 F.3d at 698.

[9] Even if Przybysz could demonstrate that Sgt. Williams had an affirmative duty to protect Thomas, she has not shown that Sgt. Williams fell short of that duty. Sgt. Williams called Thomas within hours of learning about the threats. Thomas, however, was unconcerned; he told her he could fend for himself and offered to facilitate yet another controlled buy. Having found "nothing . . . major" in Warnka's criminal history, Sgt. Williams believed Thomas was safe. We know in retrospect that she was mistaken. But such a miscalculation is, at most, negligent. And "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *see also Jones*, 438 F.3d at 695; *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001) (both noting that an officer violates substantive due process rights only where his conduct is so egregious that it shocks the conscience).

State's failure to protect an individual from private violence, even in the face of a known danger, ordinarily "does not constitute a violation of the Due Process Clause." 489 U.S. at 197.

Because plaintiff has not demonstrated a violation of Thomas' constitutional rights,[10] I grant defendants' motion for summary judgment in favor of Sgt. Williams in her individual capacity.

### B. *Monell* Action Against the City of Toledo

"No one is liable for a constitutional violation that never occurred. That includes local governments." *Gohl v. Livonia Public Schs. Dist.*, 836 F.3d 672, 685 (6th Cir. 2016). "After all, 'if a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the municipality might have authorized unconstitutional conduct is quite beside the point." *D'Ambrosio v. Marino*, 747 F.3d 378, 391 (6th Cir. 2014) (citation and brackets omitted). Defendants are entitled to summary judgment on plaintiff's *Monell* claim for this reason alone.

But to cover all bases, I note that plaintiff likewise failed to show that Toledo maintains an unconstitutional policy of failing to train its officers to conduct informant investigations.

"[U]nder § 1983, local governments are responsible only for 'their *own* illegal acts.' They are not vicariously liable . . . for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citations omitted). Instead, a plaintiff looking to hold a city employer liable must

---

[10]Nor has she identified any Sixth Circuit or Supreme Court precedent putting Sgt. Williams on notice that failing to do more for Thomas could violate his constitutional rights. Haugh attacked Thomas in 2016, but the Sixth Circuit did not issue the *Nelson* decision until 2017. At the time of the murder then, the Circuit's earlier decision in *Summar*, *supra*, still controlled. The *Summar* court explicitly rejected the very argument Przybysz makes here–that a disclosing officer should be liable for "increasing the risk that [the informant] will be exposed to private acts of violence." 157 F.3d at 1059 n.2 (citation omitted).

"identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. Of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61.

Przybysz relies on the third category. She contends that Toledo maintains a widespread practice of providing "no training for [police officers] handling informants." (Doc. 38, ID 688).

This is simply not so.

Sgt. Williams joined the vice unit in 2013, and in her first year, received on-the-job training with the more experienced Sgt. William Bragg. Bragg instructed Sgt. Williams on "what [she] should look for" when scouting for dealers, what do when "working with CIs," "writing out the affidavits," and "everything that was involved within the vice unit." (Doc. 40, ID 841).

Sgt. Williams also completed an "undercover survival" training course, "designed to allow students to observe and review undercover operations that culminated with violence against the undercover officer and arrest teams." The course included cases studies "specifically selected for their relevance to the types of narcotic investigation[s] . . . typically conducted" by Toledo Police Officers. (Doc. 37-5, ID 625-26).

And notwithstanding the tragic outcome in this case, the facts demonstrate that Sgt. Williams' training was constitutionally adequate.

Sgt. Williams contacted Thomas within six hours of learning that Warnka was threatening him. Thomas told her, however, that he was not fearful of Warnka, and was "able to protect himself." (Doc. 37-1, ID 608). He "was not actually concerned for his safety for various

reasons, one of them being" his past friendship with Warnka, and another being his desire to continue to work as an informant. (*Id.* at 609).

Sgt. Williams also ran a criminal background check on Warnka, and knew that Warnka's record "contained no crimes of violence." (*Id.*). What is more, Sgt. Williams did not suggest that Warnka could threaten Thomas without consequence. She advised Thomas to save the text messages, with the hope of later pressing intimidation charges against Warnka. (Doc. 40, ID 852). She was unaware of Warnka's relationship with Haugh, the individual who ultimately murdered Thomas. (Doc. 37-1, ID 609).

Plaintiff's insistence that a "proper[]" policy could have gone further, by requiring Sgt. Williams to inform her supervisor, or seek approval from a prosecutor before gauging Thomas' interest in informant work, is not persuasive. (Doc. 38, ID 689). Under either circumstance, an officer in Sgt. Williams' position still faces the same dilemma: what to do about an informant who reported threats, but maintained that he was "not concerned" about them, and wished to continue working as an informant.

More to the point, "showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Connick*, 563 U.S. at 68. "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton v. Harris*, 489 U.S. 378, 392 (1989). "[P]lainly, adequately trained officers occasionally make mistakes; the fact that they do so says little about the training program or the legal basis for holding the city liable." *Id.* at 391.

Given the lack of any causal connection between a deficiency in training and Thomas' death, or indeed, constitutional injury to any citizen, the City "can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62. I therefore grant defendants summary judgment on plaintiff's *Monell* claim.

### C. Ohio Wrongful Death claim

Finally, plaintiff asserts a state law wrongful death claim against the City and Sgt. Williams individually. Defendants counter that they are immune from this claim.

Ohio grants presumptive immunity to political subdivisions and their employees, absent certain exceptions. In relevant part, political subdivisions are only liable in the following situations, as detailed in O.R.C. § 2744.02(B):

> (2) Except as otherwise provided in sections 3314.07 and 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions.
>
> * * *
>
> (4) Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code.
>
> (5) In addition to the circumstances described in divisions (B) (1) to (4) of this section, a political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed upon the political subdivision

by a section of the Revised Code, including, but not limited to, sections 2743.02 and 5591.37 of the Revised Code.

Police services are defined as a governmental, rather than proprietary, function in Ohio. O.R.C. § 2744.01(C)(2)(a), and so the lower standard of negligence in the course of performing proprietary functions afforded by ORC § 2744.02(B)(2) cannot apply. Plaintiff alleges no violation of law meeting the other statutory exceptions to immunity, such as injury due to a government building's physical defect or other express imposition of civil liability under the Revised Code.

As for Sgt. Williams, plaintiff contends she is not immune from suit because Sgt. Williams undertook her "acts or omissions . . . in a wanton or reckless manner." O.R.C. § 2744.03(A)(6)(b). I disagree.

"Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result." *Coterel v. Reed*, 72 N.E.3d 1159, 1166 (Ohio, 2016) (citation omitted). "Mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor." *Id.* (citation and brackets omitted). The actor must know, in other words, that "his conduct will in all common probability result in injury." *Id.* (citation omitted).

"Reckless conduct is characterized by the conscious disregard or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Randy v. Richland Newhope Indus.*, 57 N.E.3d 369, 378 (Ohio Ct. App. 2016).

Although the question of whether a political subdivision's employee acted wantonly or recklessly is "generally" reserved for the jury, this is not a case in which reasonable minds could differ about the outcome. *Reynolds v. City of Oakwood*, 528 N.E.2d 578, 582 (Ohio Ct. App. 1987); *see also Anderson*, 477 U.S. at 250–51.

Sgt. Williams did not "fail[] to exercise any care whatsoever." *Coterel*, 72 N.E.3d at 1166. Nor did she "conscious[ly] disregard . . . a known or obvious risk of harm" to Thomas. *Randy*, 57 N.E.3d at 378. As explained, she reached out to Thomas, and assessed the situation based on his reassurances and her knowledge of Warnka's non-violent history. Her mistaken judgment is at worst, "[m]ere negligence," *Coterel*, 72 N.E.3d at 1166, and nothing "substantially greater" than that. *Randy*, 57 N.E.3d at 378. No rational trier of fact could find that she acted wantonly or recklessly.

I therefore grant defendants summary judgment on plaintiff's wrongful death claim.

## Conclusion

It is, therefore,

ORDERED THAT:

1.    Plaintiff's motions to strike the affidavit of the undercover officer and to exclude defense expert Michael Levine's testimony (Docs. 53, 54) be, and the same hereby are, denied;

2.    Plaintiff's motion for summary judgment (Doc. 38) be, and the same hereby is, denied; and

3.    Defendants' motion for summary judgment (Doc. 37) be, and the same hereby is,

       granted as to all claims;

So ordered.

/s/ James G. Carr

Sr. U.S. District Judge
